949 A.2d 910 (2008)
In the Matter of T.D. a minor, Appeal of J.D., Father.
In the Matter of T.D., Appeal of C.M., Mother.
No. 1535 WDA 2007.
No. 1536 WDA 2007.
Superior Court of Pennsylvania.
Submitted January 28, 2008.
Filed April 25, 2008.
Reargument Denied July 2, 2008.
*912 Mari A. Hathaway, Washington, for J.D., appellant at 1535.
Tamora L. Reese, Washington, for C.M., appellant at 1536.
Erin W. Dickerson, McMurray, for T.D., appellee.
Joyce A. Hatfield-Wise, Washington, for Washington County Children and Youth, Participating Party.
BEFORE: BENDER, GANTMAN and TAMILIA, JJ.
OPINION BY BENDER, J.:
¶ 1 In these two consecutively listed appeals, Appellant, J.D. (Father), and Appellant, C.M. (Mother), collectively referred to as "Parents," appeal from the order entered on July 25, 2007, that involuntarily terminated their respective parental rights to their minor son, T.D. As Parents raise parallel arguments, we address both appeals together, and after careful review, we affirm.
¶ 2 The record supports the trial court's succinct summary of facts, which we reiterate as follows:
[Mother] and [Father] are the biological parents of [T.D.], born January 20, 1996, currently age 11. [T.D.] has been in foster care since April 8, 2005. The Family has had an extensive history with CYS, beginning at [T.D.'s] birth when Mother tested positive for cocaine. After [Washington County Children and Youth Service Agency (CYS)] was notified, [Parents] agreed to drug and alcohol services and the case closed in 1998. In 2002, CYS received a referral from the child's school for truancy. [Parents] failed to respond, and before a dependency hearing was held, [Parents] absconded *913 with [T.D.] to Florida. They were located six months later at a motel in Allegheny County, and the child was placed in foster care on June 24, 2003. [T.D.] did not attend school at all for those seven (7) months. [T.D.] was adjudicated dependant on July 22, 2003, and remained in foster care for a short period of time until August 7, 2003, when he was returned to the parents. [Parents] were ordered to continue with drug and alcohol treatment, to obtain mental health evaluations, and complete a parenting program, and to insure the child's attendance at school. Based upon the child's continued excessive absences from school, domestic violence, Mother's use of cocaine, and [F]ather's use of pain medication, the child was placed outside of [Parents'] home again on April 8, 2005. The child has remained in foster care.
. . . .
After [T.D.'s] placement, on April 8, 2005, Mother disappeared for a few months and did not visit. Beginning in the summer of 2005, Mother visited with [T.D.] weekly and provided him with gifts and letters. Visits stopped in August of 2006; Mother has had telephone contact since November, 2006. While in drug rehab, Mother completed a mental health evaluation and began a parenting program, but did not complete it.
[Father] lives in Punxsutawney, Pennsylvania, with his girlfriend, [S.S.], and her daughter in a four bedroom home. Father receives SSI, as he is unable to work due to a variety of medical problems emanating from a car accident in 1998 in which he lost his leg. According to [Father], in 2004 he was addicted to [O]xycontin, which he was legally prescribed for pain. He received in-patient treatment. After [T.D.'s] placement in April, 2005, Father was ordered to obtain a drug and alcohol evaluation. He obtained an evaluation from Gateway Institute on October 11, 2006, which indicated that he was not in need of drug and alcohol treatment. [Father] obtained a mental health evaluation by Gregory Sachs, D.O. . . . As Dr. Sachs was not a psychologist or psychiatrist, CYS deemed the evaluation inadequate. Eventually, in February 2006, Father received a more complete mental health evaluating from a CYS provider, Dr. Morris. [Father] completed a parenting program by January, 2006. [Father] has four other children, with whom he has no contact. Over the last two years, [Father] has visited with [T.D.] between eight and twelve times. The longest time between visits has been around five months. CYS offered to help defray [Father's] transportation expenses.
Trial Court Opinion (T.C.O.), 10/10/07, at 1-4 (citations to record omitted).
¶ 3 CYS filed a petition for involuntary termination of parental rights on January 11, 2007. The petition alleged that termination would best serve T.D.'s needs and welfare pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8). Following termination hearings on April 2, April 16, and May 3, 2007, and the submission of proposed findings of fact by Mother and CYS, the trial court issued an order on July 25, 2007, wherein it granted CYS's petition for involuntary termination of parental rights.[1] Mother and Father filed *914 timely appeals on August 21, 2007. Thereafter, on August 30, 2007, the trial court ordered Mother and Father to file concise statements of matters complained of on appeal pursuant to Pa.R.A.P.1925(b). Mother and Father complied with the trial court's order filing their respective Rule 1925(b) statements on September 5, 2007.
¶ 4 On appeal, Father presents the following questions for our review:
1. Did the trial court err in involuntarily terminating [Father's] parental rights in that Washington County Children and Youth Service Agency failed to meet its burden of proof by clear and convincing evidence that . . . termination of parental rights best serves the needs and welfare of [T.D.] under Section 2511(a)(1), (2), (5) and (8) of the Adoption Act?
Did the trial court err in involuntarily terminating [Father's] [parental] rights in that Washington County Children and Youth Service Agency failed to meet its burden of proof by clear and convincing evidence that termination of [Father's] parental rights would best serve [T.D.'s] needs and welfare of [T.D.] under section 2511(b) of the Adoption Act?
Father's brief at 4.
¶ 5 Similarly, Mother raises the following issues on appeal:
I. Whether the trial court erred in terminating [Mother's] parental rights pursuant to sections 2511(a)(1)[,](2)[,](5)[,] and (8) of the Adoption Act?
II. Whether the trial court erred in finding that [Mother's] parental rights should be terminated based upon the totality of the circumstances?
III. Whether the trial court erred in finding that the termination of [Mother's] parental rights served [T.D.'s] needs and welfare under section 2511(b) of the Adoption Act?
Mother's brief at 4.
¶ 6 Our standard of review regarding orders terminating parental rights is as follows:
When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.
In re S.H., 879 A.2d 802, 805 (Pa.Super.2005). In termination cases, the burden is upon CYS to prove by clear and convincing evidence that its asserted grounds for seeking the termination of parental rights are valid. In re J.L.C., 837 A.2d 1247, 1251 (Pa.Super.2003).
¶ 7 We have previously stated:
The standard of clear and convincing evidence is defined as testimony that is *915 so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.
Id.
¶ 8 Requests to have a natural parent's parental rights terminated are governed by 23 Pa.C.S. § 2511, which provides in pertinent part as follows:
§ 2511. Grounds for involuntary termination
(a) General rule.  The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent
* * *
(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.
* * *
(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.
* * *
(b) Other considerations.  The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
23 Pa.C.S. § 2511.
¶ 9 This Court applies a two-part test for termination of parental rights. In *916 In re L.M., 923 A.2d 505, 511 (Pa.Super.2007), we stated:
Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.
¶ 10 In relation to the trial court's determinations regarding section 2511(a)(1), (2), (5) and (8), the crux of Parents' complaints are that the trial court failed to consider certain facts in deciding whether to terminate their parental rights. We address the parties' arguments together.
¶ 11 In concluding that CYS established, by clear and convincing evidence, that Parents failed to perform their parental duties for at least twelve months, failed to remedy the causes that led to T.D.'s removal, and are not likely to remedy the causes within a reasonable period, the trial court reasoned as follows:
As of the date of the [termination] hearing, the child had been out of [Parent's] care for over two (2) years. The underlying inquiry is whether each parent reasonably and sufficiently worked toward the return of their child. "When the child is in foster care, this affirmative duty requires the parents to work towards the return of the child by cooperating with the Agency to obtain rehabilitative services necessary for them to be capable of performing their parental duties and responsibilities." In re B.P.-R.[G.P.-R.], 851 A.2d 967, 977 (Pa.Super[.] 2004).
The Court found that [Parents] evidenced by their actions and inactions, a failure to perform their parental duties. Since the child's placement, [Mother] was repeatedly incarcerated, moved from place to place and even after successful drug and alcohol treatment, did not have suitable housing. She currently resides in a one-bedroom apartment and acknowledged that she was unable to be an "immediate resource" for the child. She was unemployed and had not visited for eight (8) months. The Court appreciated her sobriety, but found her efforts lacking and that she needed to do more to reunite with her son. Perhaps maintaining sobriety was all that she could do, but the child has needed more. She chose to move four (4) hours away substantially hindering her visitation and negatively impacting her relationship with her son[.][S]he had not worked closely with CYS. [T.D.] cannot put his life on hold while [Mother] makes theses choices. The Court found that [T.D.] needs a permanent home and not vague future promises. [Mother] has not exerted herself to take and maintain a place of importance in [T.D.'s] life.
Similarly, the Court found that [Father] has not performed his parental duties. He failed to obtain the court ordered services in a timely manner. He did not successfully complete his drug and alcohol program in 2005, as he checked out "against medical advice," presumably a day away from completion. The drug and alcohol evaluation was woefully inadequate as it failed to recognize father's past problems, both as he admitted and as reported to CYS by *917 Mother. It took him over nine months to complete a mental health evaluation. Most significantly, the Father evidenced an abject failure in fulfilling his responsibility to visit and maintain a relationship. He has offered feeble excuses for many of the missed visits. For instance, one reason given was that a visit was scheduled on the birthday of [S.S.'s] teenage daughter. Another reason was that [S.S.'s] dog was ill and had to be taken to the veterinarian and therefore, he had no transportation. He also indicated that he was unable to afford the cost of the trip, which he claimed to be three (3) hours. Yet, Father never asked CYS for assistance in paying for transportation until 2007. Further, during phone conversations, Father has inappropriately discussed these legal proceedings, placed pressure on [T.D.] and told him that Mother will probably end up dead from drugs. [Father] accepts no responsibility for the child's placement, his past truancy, and for his prolonged time in foster care. [Father], like [Mother], chose to move hours away from [T.D.], hindering their relationship. [Father] offered no immediate cogent plans to have [T.D.] returned to him. [Father] has evidenced minimal exertion to take and maintain a place of importance in [T.D.'s] life.
. . .
In conclusion, the child had been out of either parent's care for over two (2) years. The prolonged period of time established that neither parent can remedy the problems which led to the child's removal. They have been given ample time to place themselves in a position to care for [T.D.], but as of yet, have not done so. Based on the totality of the circumstances, the Court found that the evidence presented established that [Parents] have failed to perform their parental duties for over twelve months, have failed to remedy the causes that led to the child's removal, and are not likely to remedy those causes within a reasonable period of time.
T.C.O. at 6-9.
¶ 12 The competent evidence of record supports the trial court's determination. During the custody hearing, CYS caseworker Jerdean Beatty testified that she has been assigned to this case since 2003 and has been providing direct casework services for the past three years. See N.T. Dependency Hearing, 4/2/07, at 13. However, Ms. Beatty indicated that CYS first became involved with the family upon T.D.'s birth because Mother tested positive for cocaine. Id. at 7. CYS subsequently closed the case and reopened it in 2002 due to T.D.'s chronic truancy, and T.D. was adjudicated dependant on July 22, 2003. Id. at 8-9. T.D. was briefly removed from his parents between June 24, 2003 and August 7, 2003, and has remained in CYS placement since April 8, 2005. Id. at 10. Hence, T.D. has been removed from Parents for an aggregate period of more then two years. Id. at 11.
¶ 13 Ms. Beatty also testified that CYS fashioned a family service plan (FSP) requiring Mother and Father to complete drug and alcohol evaluations, mental health evaluations, and parenting classes. Id. at 10-13. However, on December 11, 2006, approximately fifteen months after the adjudication of dependency, the trial court approved CYS's decision to change the goal of the FSP from family reunification to termination because Parents failed to comply with the FSP's court-ordered requirements. Id. at 14. Prior to seeking the goal change, Ms. Beatty informed Mother and Father that compliance with the FSP was imperative, and that they risked running out of time to satisfy the *918 requirements. Id. at 14-15. Nonetheless, Parents refused to comply. Id. at 14.
¶ 14 Ms. Beatty testified that, at the time of the goal change, Mother still had not demonstrated sobriety to CYS, or completed mental health evaluations, drug and alcohol evaluations, and parenting classes. Id. at 17, 44-45. Indeed, Ms. Beatty testified that, although Mother visited with T.D. regularly until she was incarcerated for failing to pay child support for T.D.'s half-brother, her utter failure to comply with any of the FSP requirements or maintain her sobriety led CYS to seek to terminate her parental rights. Id. at 36, 44-45. In fact, for more than two years Mother never complied with the terms of the FSP and failed to obtain suitable housing. Id. at 46.
¶ 15 Moreover, upon leaving jail in August 2006, Mother elected to move to York County, four hours away from T.D.'s foster home.[2] N.T. Termination Hearing, 4/16/07, at 160. Mother believes that residing in Washington County would cause her to relapse. Id. at 173. Following the move to York, Mother did not visit T.D.; instead, she initiated contact with T.D. via telephone and mail. Id. at 170. Indeed, Mother has not visited with T.D. since August 25, 2006, approximately four months before the goal change. Id. at 168. Mother, who has no stable employment, was re-incarcerated prior to the termination hearings. Id. at 159, 167, 179.
¶ 16 Likewise, as of the goal change, Father had not completed an acceptable drug and alcohol evaluation. N.T., 4/2/07, at 21. Ms. Beatty explained that while Father submitted a one-page drug and alcohol evaluation, CYS did not believe that he had been forthright with the doctor who performed the evaluation. In particular, CYS found that Father failed to disclose either that the evaluation had been court ordered or that he had had prior drug and alcohol treatment. Id. at 22-23. Thus, CYS rejected the evaluation Father sought to submit. Id. Similarly, Father did not file an acceptable mental health evaluation until after the CYS changed the goal to termination. Id. at 23. Father originally submitted a one-paragraph mental health evaluation conducted by Gregory Sachs, D.O., which CYS rejected as lacking depth and detail. Id. at 23-24. Ms. Beatty also observed that Dr. Sachs was not a psychiatrist or psychologist. Id. at 24. Eventually, however, Father did comply with the family service plan by submitting an acceptable mental health evaluation conducted by an approved physician and by successfully completing parenting classes. Id. at 26. However, the evaluation did not lead CYS to determine that Father could safely and adequately provide for T.D. Id. Ms. Beatty also indicated that Father flatly refused CYS's offers to provide additional services, and she reiterated Father's refusal to cooperate in the juvenile proceedings. Id. at 40-41. In addition, Father admitted to leaving an in-patient drug and alcohol program for opiate dependence against medical advice and one day prior to completing the program. N.T., 4/16/07, at 234-236, 270. In explaining the circumstances of his unauthorized discharge, Father stated "[i]t was almost a rebellious, however stupid, it was a rebellious act on my part because I had already [completed] one in the past." Id. at 234. As the record supports the trial court's finding that Mother and Father failed to satisfy the court ordered terms of the FSP in a timely manner, we will not disturb it.
*919 ¶ 17 Next, we address the trial court's determination that Father failed to visit T.D. on a regular basis, and we agree that Father has not made consistent and meaningful efforts to maintain a presence in T.D.'s life. As this Court has stated:
It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life.
In re G.P.-R., 851 A.2d 967, 977 (Pa.Super.2004).
¶ 18 We also observed,
To be legally significant, the [post-abandonment] contact must be steady and consistent over a period of time, contribute to the psychological health of the child, and must demonstrate a serious intent on the part of the parent to recultivate a parent-child relationship and must also demonstrate a willingness and capacity to undertake the parental role. The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question.

In re D.J.S., 737 A.2d 283, 286 (Pa.Super.1999) (quoting In re Adoption of Hamilton, 379 Pa.Super. 274, 549 A.2d 1291, 1295 (1988)) (emphasis added). "[A] parent's basic constitutional right to the custody and rearing of his . . . child is converted, upon the failure to fulfill . . . parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent, healthy, safe environment." In re B., N.M., 856 A.2d 847, 856 (Pa.Super.2004), appeal denied, 582 Pa. 718, 872 A.2d 1200 (Pa.2005).
¶ 19 During the termination hearing, Ms. Beatty testified that over the past twenty-five months that T.D. has been in foster care, Father had very sporadic visitation, attending approximately eight of forty-three scheduled weekly visits since May 2006. N.T., 4/2/07, at 27. She also indicated that the majority of the visits Father missed were no-shows for which Father provided no explanation. Id. at 28. On other dates, Father would proffer marginal excuses for missing his appointments. Id. For example, on one date Father canceled a visit because T.D. had poison ivy, and Father feared that he would become infected. Id. On other occasions, Father canceled visits due to diarrhea, a minor car accident, to care for his girlfriend's sick dog, and to attend a birthday party for his girlfriend's daughter. Id. at 29. Similarly, Ms. Beatty indicated that Father did not celebrate Christmas 2006 with T.D. until weeks after the holiday. Id. at 30. Father informed Ms. Beatty that he was suffering severe pain in his injured leg. Id. at 70. Significantly, Ms. Beatty testified that Father's absences devastated T.D., particularly Father's absence on Christmas. Id. at 28-30.
¶ 20 In addition to sporadic visitation, Father mishandled his telephone contact with T.D. According to Ms. Beatty, Father discussed the termination proceedings with T.D. and suggested that T.D. would be "home" by a given date. Id. at 32. Father also advised a then ten-year-old T.D., "Don't be surprised if you find your mother dead in an alley from drugs." Id. Based upon these inappropriate remarks, CYS began monitoring Father's telephone calls. Id. Again, the record supports the court's determination that Father has not made consistent meaningful efforts to maintain a presence in T.D.'s life.
¶ 21 Thus, our review of the record in the case sub judice convinces us that competent evidence exists to support the trial court's determination that, under the totality of the circumstances, the elements of § 2511(a)(1), and (2), have been met with *920 regard to both Mother and Father. The record reflects that Parents have failed to perform parental duties for at least six months preceding the filing of the January 11, 2007 petition for termination. Mother, a fugitive for the majority of the six-month period, made no effort to visit T.D. while he was placed in foster care. Similarly, Father not only wasted several opportunities to interact with T.D. in any meaningful manner, by missing the majority of his scheduled visits and utterly mishandling his telephone conversations with his son, Father impaired T.D.'s well-being. Moreover, despite CYS's best efforts to reunify T.D. with Parents, Mother and Father failed to take the required steps toward assuming full parental responsibilities either prior to the goal change or following the petition to terminate parental rights. Thus, under the totality of the circumstances, Parents failed to perform their parental duties, and they have been unable to remedy the conditions causing their incapacity to render parental care. See In re B., N.M., 856 A.2d at 855 (Pa.Super.2004) ("Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision."). Accordingly, we agree with the trial court's conclusion that grounds for termination have been established under section 2511(a)(1) and (a)(2). See In re A.L.D. 797 A.2d 326, 337-340 (Pa.Super.2002) (parents are required to make diligent efforts towards reasonably prompt assumption of full parental responsibilities and parent's vow to cooperate, after a long period of uncooperativeness regarding necessity or availability of services, may properly be rejected as untimely or disingenuous).
¶ 22 Having found that the record supports the trial court's determinations under subsections 2511(a)(1) and (a)(2), we do not confront Parents' remaining complaints challenging the court's determinations under subsections (a)(5) and (a)(8). In re B.L.W., 843 A.2d 380, 384 (Pa.Super.2004) (en banc) (citations omitted), ("[W]e need only agree with [the trial court's] decision as to any one subsection in order to affirm the termination of parental rights.").
¶ 23 Next, we address Parents' challenge to the trial court's determination pursuant to section 2511(b) that termination of their parental rights would best serve T.D.'s needs and welfare. Parents complain that the trial court failed to consider the emotional bonds that T.D. has maintained with both Parents and his contact with members of his extended family. The record bears out that the trial court did, in fact, weigh the proper considerations prior to terminating the parental rights of Mother and Father.
¶ 24 A proper section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In In re C.M.S., 884 A.2d 1284, 1287 (Pa.Super.2005), the Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we have instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. Id.
¶ 25 The instant case presents a dichotomy wherein obvious emotional ties exist between T.D. and Parents, but Parents are either unwilling or unable to satisfy the irreducible minimum requirements of parenthood. In weighing the pertinent considerations, *921 the trial court reasoned as follows:
[T.D.] is in a home that may be an adoptive one if, after termination, the child wishes to remain with [his foster family]. The child at this time is ambivalent about adoption; this ambivalence is understandable in light of his uncertainty as to his future and his parent's involvement. However, Laura Doran, an Adoption Specialist who has provided services to [T.D.], opined that adoption would be in [T.D.'s] best interest, and the only avenue for permanency in this case is by adoption. The child has a bond with his parents. He especially enjoys the time with his Mother. The Court recognizes that severing that bond will cause [T.D.] to experience grief and loss. However, he has already experienced the grief [and] the loss of his parents [due to] their inability to be parents to him for over two years. In a case involving an older child, the connection [between] the child and the parents is stronger. In addition to recognizing the bond, the Court must also consider the ramifications of not terminating the parental rights and freeing [T.D.] for adoption. [T.D.], according to Ms. Doran, seems to be unable to make an honest commitment to his foster family because he clings to the empty promises of his parents. This has to thwart his emotional development at a critical stage in his life, as he develops into a young man. The issue is not only whether there is a bond that exists between parent and the child that would be harmful if severed; the issue is what is in the child's best needs and interest [under] the totality of the circumstances. This child deserves permanency in his life that his parents are unable to give him.
T.C.O. at 9-10 (citations to the record omitted).
¶ 26 During the termination hearings, Laura Doran, the adoption supervisor for Adelphoi Village, testified that adoption was in T.D.'s best interest. N.T., 4/2/07, at 112, 128. Specifically, she believed Parents' repeated empty promises to T.D. were damaging. Id. at 128. Ms. Doran acknowledged that T.D. missed his biological parents and that he views reunification with his parents as the ideal goal. Id. at 118. Ms. Doran believes that a bond exists between T.D. and his parents, at least from T.D.'s perspective, and she agreed with the statement that "sever[ing] the bond . . . would be detrimental to the child." Id. at 127. However, she also testified that, since the goal of the FSP changed to adoption, T.D. indicated an acceptance toward being adopted. Id. at 118, 124, 126. Ms. Doran also pointed out that children commonly want to return to their natural parents, even in the face of abuse. Id. at 121.
¶ 27 While the record would appear to support the trial court's findings that termination of parental rights would finally establish permanency in T.D.'s life, on appeal, T.D.'s guardian ad litem points out that (1) contrary to Ms. Doran's testimony, T.D.'s then pre-adoptive foster mother testified that T.D. had informed her and his guardian ad litem that he did not want to be adopted, see N.T., 4/2/07, at 143-144; (2) T.D. no longer is residing with his putative pre-adoption foster family; and (3) as of January 20, 2008, T.D. had attained an age that required his consent to adoption pursuant to 23 Pa.C.S. § 2711(a)(1), twelve.[3]See Guardian ad litem's brief at 15. Indeed, the guardian ad litem opines, if we were to affirm the order terminating parental rights, T.D. might never achieve permanency as contemplated *922 by the trial court or the Juvenile Act, 42 Pa.C.S. § 6301, et seq.; id. at 16. Thus, in light of T.D.'s age as of the date of this writing, his apparent aversion to adoption and his removal from the pre-adoptive foster family that the trial court referenced at several points in its opinion, further review is required to determine whether the trial court's rationale remains applicable.
¶ 28 This Court confronted a similar issue in In re E.M., 908 A.2d 297 (Pa.Super.2006), and reversed the trial court's order terminating a mother's parental rights to her two children. In that case, the trial court determined that the appellant maintained sporadic contact with her two teenage children during placement and she failed to perform her parental duties. Id. at 301-302. Nevertheless, the children, who had maintained emotional bonds with their mother, desired to reunify and only would consent to adoption if it were a last resort. Id. at 307. Despite the apparent bond, the trial court found that the agency had satisfied the statutory requirements of section 2511(a) and section 2511(b). On appeal, this Court reversed, finding that, under the unique circumstances of that case, the trial court had abused its discretion in concluding that termination served the needs and welfare of the children.
¶ 29 In reaching its conclusion, this Court reasoned that, given the children's ages, fourteen and fifteen, and the requirement of their consent to adoption, the lack of an identifiable pre-adoptive home, a stable foster home willing to care for them until they reach majority, and the children's commitment to maintaining contact with their mother, even in the face of termination, "the reality is these children most likely will remain in foster care until they reach majority regardless of the outcome of this case." Id. at 306-07. Specifically, the court found, "nothing will change whether mother's rights are terminated or not, and the only thing that will be accomplished by termination is that the children will be true orphans. . . . [T]he children currently have permanency to the fullest extent possible under the circumstances." Id. at 309.
¶ 30 Later, in In re K.C.F., 928 A.2d 1046 (Pa.Super.2007), this Court distinguished the facts of In re E.M. from the facts underlying that case, wherein the appellant argued that her children's ages, eleven, nine, and eight, and the lack of a pre-adoptive home would prevent them from being adopted. As the In re K.C.F. Court observed, unlike the children in In re E.M., the three children at issue in In re K.C.F., had not yet reached the age where consent was required for adoption, and two of the children acknowledged that the Mother could not consistently meet their needs. Id. at 1053. Similarly, while the remaining child preferred to reunite with his mother, he was not secure in her presence. Id. Accordingly, noting that the Juvenile Act does not require pre-adoptive placement as a precondition to termination of parental rights, we found that the mother did not establish that her children's ages would prevent them from being adopted.
¶ 31 The case at bar aligns with In re K.C.F. rather than In re E.M. Herein, T.D. is only twelve, and although he must consent to adoption, he still is several years from reaching the age of majority. Moreover, his foster placement is uncertain. T.D. has been removed from the pre-adoptive foster home in which he resided since August 2006, and in stark contrast to the children in In re E.M., the record does not indicate that his present foster home, the second since being removed from pre-adoptive care, is committed to caring for him for six years until he is eighteen. Hence, the unique circumstances *923 that compelled our conclusion in In re E.M. are absent from this case. As in In re K.C.F., T.D.'s age, loyalty to his natural parents, and apparent lack of an identifiable pre-adoptive placement will not automatically preclude him from attaining permanency after parental rights have been terminated. See In re K.C.F., 928 A.2d 1046. In contrast, however, in light of Parents' demonstrated inability to provide the minimum level of parental care, preserving Mother's and Father's parental right, would foreclose any hope for adoption and condemn T.D. to foster care until he reaches majority. Accordingly, the court did not abuse its discretion in concluding that termination best serves T.D.'s needs and welfare.[4]
¶ 32 Having found that the trial court's decision is supported by competent evidence, we affirm the order granting CYS's petition to involuntarily terminate the parental rights of Mother and Father pursuant to 23 Pa.C.S. § 2511(a) and (b).
¶ 33 Order affirmed.
¶ 34 Judge TAMILIA files a dissenting opinion.
DISSENTING OPINION BY TAMILIA, J.:
¶ 1 I respectfully dissent and would hold that termination of the parental rights of C.M. and J.D., without prospective adoptive parents or any plan to achieve permanency for the young man at issue, is not in the best interests and does not meet the emotional needs and welfare of 12-year-old T.D.
¶ 2 While the Juvenile Act does not require pre-adoptive placement as a prerequisite to involuntary termination of parental rights, the purpose of the Act is to provide permanency and finality in a procedure which forever removes children from the custody of their biological parents.
§ 6301 Short title and purposes of the chapter
. . .
(b) Purposes.  This chapter shall be interpreted and construed as to effectuate the following purposes:
(1) To preserve the unity of the family whenever possible or to provide another alternative permanent family when the unity of the family cannot be maintained.
42 Pa.C.S.A. § 6301, Short title and purposes of chapter (b) Purposes.  (emphasis added).
¶ 3 Relying on the facts peculiar to In re K.C.F., 928 A.2d 1046 (Pa.Super.2007), the majority opines that to deny termination would "foreclose any hope for adoption and condemn T.D. to foster care until he reaches majority." Majority Memorandum at 923. I believe that to terminate the parental rights of T.D.'s parents, without a definitive plan for T.D.'s future, does him a greater injustice, effectively making him, a 12-year-old young man who has expressed his desire to not be adopted, an orphan *924 without cause. See In re E.M., 908 A.2d 297 (Pa.Super.2006).
¶ 4 The guardian ad litem who, by definition, is the individual entrusted with protecting the rights of the minor child, maintains that termination, at this point in time, does not meet the needs and welfare of T.D. Guardian Ad Litem's brief at 12. In addition to other positive factors, he further points out that T.D. "has a strong bond with both parents", "desperately wants to see them and is saddened and depressed when he does not." Id. at 13. I agree with the guardian ad lite m's assessment of T.D.'s situation.
¶ 5 The majority seeks to distinguish E.M. from K.C.F., but if analyzed in relation to the dynamics of termination and adoption proceedings, K.C.F. provides less support to the trial court's finding than does E.M. to the parents position. It is beyond question that the facts of the case before us clearly support the finding of the trial court on termination pursuant to 23 Pa.C.S.A. § 2511, Grounds for involuntary termination, (2), (5) and (8). These sections of the act are clearly supported by competent testimony presented by CYS caseworker Jerdean Beatty, who has been assigned to the case since 2003 and during the CYS Family Service Plan (FSP) following the adjudication of dependency, and thereafter, following court approval of CYS's decision to change the goal of the FSP from family reunification to termination because parents failed to comply with the FSP's court-ordered requirements. The majority carefully delineated the evidence relied upon by the trial court in reaching its decision to terminate the parental rights of father, J.D., and mother, C.M., and found that under the totality of the circumstances, the elements of section 2511(a)(1) and (2) were met as to both parents. Correctly, finding that the record supports the trial court's determination under subsections 2511(a)(1) and (2), the majority properly bypassed confrontation of the parents' remaining complaints challenging the court's determinations under subsections (a)(5) and (a)(8) citing In re B.L.W., 843 A.2d 380, 384 (Pa.Super.2004) (en banc) (citations omitted).
¶ 6 It is at this juncture that section 2511 implicates an additional element of considerations, which focuses on the emotional needs and welfare of the child.
(b) Other considerations  The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.
Although I agree with the lower court and the majority that termination was proper under the sections 2511(a)(1) and (2), the statute mandates us to next look to section 2511(b) as an intangible consideration which preempts sections 2511(a)(1) and (a)(2), as we consider the developmental, physical and emotional needs and welfare of T.D.
¶ 7 When the parent/child relationship is examined, it appears that the trial court and the panel majority ignore significant aspects of the relationship between T.D. and his parents. As expressed by the guardian ad litem, social workers, parents, child and foster parents, a plethora of bonding exigencies to the parents, and antipathy *925 to adoption clearly and explicitly exist.
¶ 8 Agency caseworker Beatty testified that she believed it to be in the best interest of the minor child that parental rights of both parents be terminated at this time. She admitted, however, she has no doubt T.D. loves his father and that his father loves him; that T.D. looks forward to visits with both parents; and that T.D. is clearly bonded with both parents. N.T., 4/2/07, at 82-83. Beatty related that although the father is an amputee, he plays ball with the child and is loving and appropriate during the visits. Id. at 82-83.
¶ 9 Laura Doran, adoption supervisor at Adelphoi Village, testified that she has provided and supervised permanency preparation counseling, and while recommending termination, on cross-examination she admitted that T.D. is bonded with his parents and that it would adversely impact him if parental rights are terminated. Id. at 127.
¶ 10 Denise Cox, T.D.'s foster mother at the time of the termination hearing, testified the child was placed with her in August 2006. Explaining that T.D. emotionally distances himself from his foster family, she stated that she is currently unwilling to adopt T.D. because he "emotionally is not with us." Id. at 130-131, 145. Further, on cross-examination by counsel for mother, Cox testified that T.D. has indicated to her that he does not wish to be adopted. N.T., 4/16/07, at 144.
¶ 11 Father also testified that T.D. told him that he does not wish to be adopted; T.D. also told him, "Daddy, what I want for Christmas is to come home." Id. at 242. Further, father described significant life style changes which might offer better living conditions for T.D. Id. at 228-29, 234.
¶ 12 Finally, the guardian ad litem agrees with the trial court that pursuant to 23 Pa.C.S.A. § 2511(a)(1)(2) and (8), there is clear and convincing evidence to support the termination of parental rights. The guardian ad litem adds an addendum to the trial court's finding, however, and points out that the evidence presented by the witnesses detailed above establishes that the child does not wish to be adopted and although he lives in a foster home that may be pre-adoptive in the future, his foster parents were unwilling to adopt T.D. on the date of the termination hearing due to him not being emotionally attached to their family. In support of his opinion that parental rights should not be terminated at this time, the guardian ad litem concisely and clearly states:
As [T.D.] has continued to voice his desire to not be adopted, this Guardian Ad Litem has real concerns that if the termination of his parental rights were to be affirmed by this Honorable Court, then T.D. would become a true orphan and never achieve permanency as contemplated by the Pennsylvania adoption laws. Further, since the conclusion of the termination hearing [4/2/07; 4/16/07], T.D. has been moved to two new foster homes. He is doing well in his current placement, but still is uncomfortable with the idea of his adoption. It remains unclear at this time whether his current placement is pre-adoptive.
Guardian Ad Litem's brief at 15-16.
¶ 13 In conclusion, while the caseworkers, trial judge and majority appear impelled to produce a result that is in the best interest of the child, it is a standard which does not apply in this situation. The Legislature, in its wisdom, has imposed two supervening criteria to the involuntary termination procedure and evidentiary findings that are controlling in most cases. Both are applicable to this *926 case. The first is expressed in our review and discussion of section 2511(a)(1) and (2), under section 2511(b), Other considerations, supra. The second is pursuant to 23 Pa.C.S.A. § 2711, Consents necessary to adoption.
(a) General rule.  Except as otherwise provided in this part, consent to an adoption shall be required of the following:
(1) The adoptee if over 12 years of age.
The majority somehow construes T.D.'s age of 12 to be negotiable under the statute because he is six years away from the age of majority. This attempt to find "wiggle room" in the statute is improper and is done in a manner such as to ignore the overwhelming evidence that the court and CYS in the proceeding below failed to establish that the developmental, physical and emotional needs and welfare of T.D. will be met by terminating his relationship with his parents. For this reason, involuntary termination was not legally possible, and at the age of 12, adoption cannot go forward without T.D.'s consent. If the adoption cannot proceed, then termination of parental rights should not be an option because it leaves the child in limbo and being an orphan with no likelihood of imminent adoption.
¶ 14 The proper resolution of this quandary is to have the case remanded for additional review of a permanency plan which continues to involve T.D. with his parents while assuring his best interests, needs and welfare are served in fundamentals of child care, schooling and surrogate parenting. Since there is time between T.D.'s present age of 12 and his majority, it is possible that a better resolution resulting in adoption might occur with a less demanding approach. As propounded in E.M., I firmly believe, "[a]lthough the statutory criterion has been met for termination, the court abused its discretion in concluding termination serves the needs and welfare of these children." In re E.M., supra at 309.
NOTES
[1] The Adoption and Safe Families Act of 1997 (ASFA), P.L. 105-89, 1997 HR 867 (November 19, 1997), 42 U.S.C. § 671-675, imposes upon states the requirement to focus on the child's needs for permanency rather than the parent's actions and inactions. The amendments to the Juvenile Act, 42 Pa.C.S. § 6301, et seq., provide that a court shall determine certain matters at the permanency hearing, including whether the child has been placed into foster care for 15 out of the last 22 months. See 42 Pa.C.S. § 6351(f)(9). With regard to permanency planning, the Legislature contemplated that, after reasonable efforts have been made to establish the biological relationship, the process of the Agency working with foster care institutions to terminate parental rights should be completed within eighteen months. See In re N.W., 859 A.2d 501, 508 (Pa.Super.2004). The time requirement of the Adoption and Safe Families Act, as incorporated in the Juvenile Act, was satisfied in this case.
[2] Mother was not released from Washington County Jail. Instead, on August 29, 2006, she left on furlough and simply absconded. Mother subsequently was charged with misdemeanor escape.
[3] It is unclear whether T.D.'s current foster placement is pre-adoptive.
[4] With regard to the position taken in the dissenting opinion, we are puzzled by some of the comments, i.e., that the majority has not applied the proper standard and that the majority construes the child's age as negotiable, allowing for "wiggle room." See Dissenting Opinion at 926. Without more we find it difficult to reply, especially in light of the dissent's statement that the best interest of the child standard does not apply in the present matter. See In re L.M., 923 A.2d at 511 (stating that the analysis under section 2511(b) requires a "determination of the needs and welfare of the child under the standard of best interests. . . ."). Moreover, the dissenting opinion's reliance on Father's testimony to support its position is misplaced in that the court found that Father lacked credibility. T.C.O. at 8.