J-S01030-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN RE: M.W., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.D. | |
| | No. 1440 WDA 2014 |

Appeal from the Order August 6, 2014
In the Court of Common Pleas of Allegheny  County
Orphans' Court at No(s): TPR 056 OF 2014

| | |
|---|---|
| IN RE: T.M., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: M.D. | |
| | No. 1441 WDA 2014 |

Appeal from the Order August 6, 2014
In the Court of Common Pleas of Allegheny  County
Orphans' Court at No(s): TPR 058 OF 2014

BEFORE:  GANTMAN, P.J., JENKINS, J., and MUSMANNO, J.

MEMORANDUM BY JENKINS, J.:                **FILED FEBRUARY 02, 2015**

Appellant M.D. ("Mother") appeals from the order entered in the

Allegheny County Court of Common Pleas, which involuntarily terminated

her parental rights to her minor children, M.W. and T.M. ("Children").[1]  We affirm.

In its opinion, the trial court fully set forth the relevant facts of this appeal.  Therefore, we have no reason to restate them.  On April 10, 2014, the Allegheny County Office of Children, Youth and Families ("CYF") filed a petition for involuntary termination of Mother's parental rights to Children.  Following a hearing on the petition, the court entered an order terminating Mother's parental rights to Children on August 6, 2014.  On September 4, 2014, Mother filed a timely notice of appeal along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i).

Mother raises the following issue for our review:

> DID THE TRIAL COURT ABUSE ITS DISCRETION AND/OR ERR AS A MATTER OF LAW IN CONCLUDING THAT CYF MET ITS BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT TERMINATION OF MOTHER'S PARENTAL RIGHTS WOULD BEST SERVE THE NEEDS AND WELFARE OF [CHILDREN] PURSUANT TO 23 PA.C.S. § 2511(B)?

Mother's Brief, p. 7.

Our standard of review is as follows:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence.  Absent an abuse of discretion, an error of law,

_____

[1] The court also terminated the parental rights of the two natural fathers of Children, neither of whom appealed.  Further, Mother has four other children, none of whom are the subject of this appeal.

or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that it would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

Furthermore, we note that the trial court, as the finder of fact, is the sole determiner of the credibility of witnesses and all conflicts in testimony are to be resolved by [the] finder of fact. The burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.

The standard of clear and convincing evidence means testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitation, of the truth of the precise facts in issue. We may uphold a termination decision if any proper basis exists for the result reached. If the trial court's findings are supported by competent evidence, we must affirm the court's decision, even though the record could support an opposite result.

*In re Adoption of K.J.*, 936 A.2d 1128, 1131-32 (Pa.Super.2007), *appeal denied*, 951 A.2d 1165 (Pa.2008) (internal citations omitted).

CYF filed its petition for the involuntary termination of Mother's parental rights pursuant to the Adoption Act, 23 Pa.C.S. § 2101, *et seq*. Specifically, CYF's petition sought termination on the following grounds:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

- 3 -

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

* * *

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

* * *

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

* * *

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the

basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511. "Parental rights may be involuntarily terminated where any one subsection of Section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa.Super.2010).

"A proper section 2511(b) analysis focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child." *In re T.D.*, 949 A.2d 910, 920 (Pa.Super.2008), *appeal denied*, 970 A.2d 1148 (Pa.2009). "Intangibles such as love, comfort, security, and stability are involved when inquiring about the needs and welfare of the child." *In re C.P.*, 901 A.2d 516, 520 (Pa.Super.2006). "In addition, we have instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *In re T.D., supra*. Section 2511(b), however, "does not require a formal bonding evaluation." *In re Z.P., supra* at 1121.

Further, we observe:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of

- 5 -

a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this court has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent exert himself to take and maintain a place of importance in the child's life.

Parental duty requires that the parent act affirmatively with good faith interest and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his...ability, even in difficult circumstances. A parent must utilize all available resources to preserve the parental relationship, and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with [the child's] physical and emotional needs.

*In re Z.P.*, *supra* at 1118-19 (internal citations omitted). "[A] parent's basic constitutional right to the custody and rearing of his...child is converted, upon the failure to fulfill his...parental duties, to the child's right to have proper parenting and fulfillment of his...potential in a permanent, healthy, safe environment." *In re B.,N.M.* 856 A.2d 847, 856 (Pa.Super.2004), *appeal denied*, 872 A.2d 1200 (Pa.2005) (internal citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Kathryn Hens-Greco, we conclude Mother's issue merits no relief. The trial court's Rule 1925(a) opinion comprehensively discusses and properly disposes of the question presented. *See* Trial Court Opinion, filed October 6, 2014, pp. 3-8 (finding: Mother first came to attention of CYS in 2002 when it received report one of Children may have been abused; Mother admitted to having anger management problems, mental health and substance abuse issues; for a decade, Mother has been unable to provide proper parental care for any significant stretch of time; Children have been active with juvenile court for duration of lives; Children have been removed from Mother over seven times, causing disruptions to permanency and harm to Children; Children's greatest stability has come in months since final removal from Mother; years of disruptions have taken toll on Children; even after utilizing CYF services, Mother has struggled to provide any sort of prolonged care; Mother repeatedly left Children unattended; Mother's mental health has regressed; Mother cannot appreciate the needs of Children; Mother cannot rectify problems and has demonstrated repeated incapability to care for Children; last removal occurred after Mother attended Family Group Decision Making Conference intoxicated with Children's two-year-old sibling, who answered door for CYS while Mother was passed out on couch; termination serves best

interests of Children). Accordingly, we affirm on the basis of the trial court opinion.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/2/2015

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

IN RE: ADOPTION OF
T.M., M.W., minor children

APPEAL OF:
M.D., natural mother

:   **CHILDREN'S FAST TRACK APPEAL**
:
:   OPINION
:   Docket No.:
:   JV-04-002016; JV-04-000269
:
:   TPR No.:
:   14-0058; 14-0056
:

   1441 WDA 2014; 1440 WDA 2014

BY:

Honorable Kathryn Hens-Greco
440 Ross Street
Suite 5077
Pittsburgh, Pa 15219

COPIES TO:

Counsel for Allegheny County Children, Youth and Family
Services:
Lilian Akin, Esq.
Fort Pitt Commons, Suite 101
445 Fort Pitt Blvd
Pittsburgh, Pa 15219

Counsel for T.M., and M.W., as Guardian ad Litem:
Amy Lynn Berecek, Esq.
Kids Voice
437 Grant Street, Suite 700
Pittsburgh, Pa 15219

Counsel For M.D.:
Raymond Sanchas, Esq.
Juvenile Court Project
436 Seventh Avenue, Fl 11
Pittsburgh, Pa 15219

FILED
14 OCT -6 PH 2:55
DEPT. OF
CIVIL/FAMILY DIVISION RECORDS
ALLEGHENY COUNTY PA

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
ORPHANS' COURT DIVISION

| | |
|---|---|
| IN RE: ADOPTION OF<br>T.M., M.W., minor children, | : **CHILDREN'S FAST TRACK APPEAL**<br>:<br>: |
| | : Docket No.: |
| APPEAL OF: | : JV-04-002016; JV-04-000269 |
| M.D., natural mother, | :<br>: TPR No.: |
| | : 14-0058; 14-0056 |
| | :<br>: 1441 WDA 2014; 1440 WDA 2014 |

OPINION

HENS-GRECO, J.

October 6, 2014

On August 6, 2014, following a full day hearing on the above captioned matter, this Court

issued an order granting the petition of the Allegheny County Office of Children, Youth and Families

("CYF") for involuntary termination of the parental rights of M.D. ("Mother"), the natural parent of

T.M. (DOB 7/11/04) and M.W. (DOB 4/20/01) pursuant to 23 Pa. C.S.A. §§ 2511(a)(2), (a)(5),

(a)(8), and §2511(b).[1] For the reasons set forth below, the Order of this Court terminating Mother's

rights to the children should be affirmed.

CYF based its petition to terminate the parties' parental rights on 23 Pa.C.S.A. §§ 2511(a)(2),

(a)(5), and (a)(8). These subsections provide for the involuntary termination of parental rights if the

petitioner can establish any of the following grounds:

(a)(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent. [...]

(a)(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which

---

[1] This Court also terminated the rights of D.F., the natural Father of M.W. as well as the parental rights of D.M., the natural Father of T.M. Neither father appealed.

1

led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child. [...]

(a)(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and the termination of the parental rights would best serve the needs and welfare of the child.

23 Pa. C.S.A. §§ 2511 (a)(2), (a)(5), (a)(8). Once the statutory grounds for involuntary termination of

parental rights have been clearly shown, the Court must consider whether the termination would meet

the needs and welfare of the child under subsection §2511(b):

(b) Other considerations. – The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6), or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petitions.

23 Pa. C.S.A. § 2511 (b). A party seeking termination of parental rights must establish by clear and

convincing evidence that the parent's conduct satisfies at least one of the statutory grounds for

termination; if it is determined that this burden of proof has been met, then the trial court must next

consider the second step of the process, which entails a determination of whether termination best

serves the needs and welfare of the child. *In re S.D.T., Jr.*, 934 A.2d 703 (Pa. Super. 2007). In

reviewing an order terminating parental rights, the appellate court "is limited to determining whether

the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an

error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand."

*In re S.H.*, 879 A.2d 802, 809 (Pa. Super. 2005). Furthermore, the trial court is "the sole determiner

of the credibility of witnesses and resolves all conflicts in testimony." *Id.*

2

In her Notice of Appeal and Statement of Errors, Mother only alleges that this Court erred when it ruled, pursuant to §2511(b), that termination was in the children's best interests. *See* Concise Statement of Matters Complained of on Appeal, at ¶ 1, respectively. Mother does not contest that CYF met its burden as to §2511(a)(2), (a)(5), (a)(8). It is an uncontested fact that the conditions that led to the children's removal are still in place, and that Mother is unable to remedy those conditions within a reasonable period of time. The only issue on appeal is whether a termination of parental rights serves the best interests of the children. With the above standards in mind, and based on the evidence admitted during the trial and the testimony of Mother, and three witnesses at trial (CYF caseworker James Ferrari, psychologist Dr. Eric Bernstein, and Foster Mother K.C.), the Court found the following facts, which persuaded the Court that it is in the children's best interest to sever M.D.'s parental rights:

M.W. and T.M. are 13 and 10 years old respectively. They have been active with the juvenile court for the entire duration of their short lives. Until they began residing with their foster mother, K.C., they had never known permanency. M.W. was initially removed on January 15, 2003. The children were removed for the last time in January 2013. *Id.*, at 111. It was the eleventh removal for M.W. and the seventh for his younger sibling T.M. *Id.* For a decade Mother has been unable to provide the proper parental care for any significant stretch of time.

As it pertains to these children, Mother first came to the attention of CYF when it received a report in August 2002 from Children's Hospital that M.W., approximately 16 months old at the time, might have been abused. *Id.*, at 98-99. At the time, Mother admitted to having anger management problems, mental health and substance abuse issues. *Id.*, at 99. She was also homeless, and living at FamilyLinks. *Id.* In January 2003, feeling overwhelmed, she voluntarily placed M.W. in CYF's care. In February, CYF created a Family Service Plan to reunify Mother and M.W. Mother began working on her goals; M.W. was returned in March 2003. Similarly, M.W. was voluntarily removed again in

3

November 2003 after Mother told CYF that she was overwhelmed; he was shortly returned. *Id.*, at 100-101. The third voluntary removal occurred when Mother was evicted from her boyfriend's house on March 20, 2004 following a domestic altercation. This placement was very brief as well, as the child must have been returned soon thereafter for he was voluntarily removed again in early April 2004 after Mother went into labor with T.M. *Id.*, at 101-102.

In August 2004, the children's case became more disconcerting. Emergency Custody Authorizations were obtained for M.W. and T.M. after an incident of domestic violence between Mother and Mother's stepfather, where the infant T.M. was knocked over. *Id.*, at 102. This was the first involuntary placement obtained by CYF. The medical examination upon intake done at Children's Hospital revealed that T.M. had severe diaper rash and M.W. had untreated ringworm. *Id.*, at 103. They were returned in November 2004. The children remained with Mother until April 8, 2005, when CYF obtained ECAs following allegations that Mother left the children unattended. *Id.*, at 104. Mother was arrested. *Id.* At this point, CYF sought a dependency case for T.M. *Id.*, at 105. There was no dependency case opened at the time for M.W. because he was living with his father and paternal grandmother. *Id.* T.M. was returned in September 2005, but M.W. was not returned to his Mother's care until July 2006. *Id.*, at 105. But again the children were purported to be left alone, and so they were removed briefly. *Id.*, at 106-107. They were out of Mother's care for a couple days, however. CYF decided to implement crisis in-home services and returned the children instead of removing the children. *Id.* On May 7, 2008, CYF received a third report that Mother left the children unattended. *Id.*, at 107. T.M. was eventually returned in March 2009; M.W. was returned in June 2009. In October 2009, the children were removed again following Mother's arrest. M.W. was returned 11 months later in September 2010; T.M. was returned on October 13, 2010. *Id.*, at 108. This marked the ninth removal for M.W. and the sixth for T.M. *Id.*, at 109. Mother voluntarily removed the children in May 2012, because she was hospitalized after her sister ran over her foot. *Id.*

4

The children were out of her care for six days. *Id.*, at 110. The children were removed for the last time in January 2013. CYF was informed that Mother attended a Family Group Decision Making conference intoxicated with the children's two-year-old sibling. *Id.*, at 111. When ECAs were obtained and CYF went to remove the children, the two-year-old sibling answered the door. He had makeup all over his face, presumably from rummaging in Mother's purse. *Id.*, al 12. Mother was passed out on the couch with the phone off the hook. *Id.*

This Court pauses to note Dr. Bernstein's testimony regarding the effects of voluntary removal versus involuntary removal. Dr. Bernstein testified that the manner in which a child is removed or separated from the caregiver will have an impact upon how that child interprets the situation. *Id.*, at 87. Put another way, there is a difference between a CYF caseworker pulling a child away from a parent during dinner, and when it is done in a way where the child understands that he or she will be cared for. *Id.* However, Dr. Bernstein notes that neither scenario is ideal. *Id.* Mother's voluntary decision to give her children to CYF when she knows she cannot care for them, however, temporary is indicative of both the maturity of a responsible parent who knows how to keep a child out of danger as well as the inability to consistently provide life-sustaining care for her children. These disruptions to permanency, to say nothing yet of the distressing reasons for them, causes harm to the children.

Dr. Bernstein testified that the disruptions compromised the strength of the connection between child and Mother. *Id.*, at 85. In turn, this translates as having a distrust in others and unpredictability in mood. *Id.* Dr. Bernstein testified that the strength of the bond or connection that the children have with Mother has also been compromised by the instability in the children's lives. *Id.*, at 86. Foster mother testified that T.M. has nightmares about being beaten and has expressed to her foster mother her fear of returning home. *Id.*, at 188. T.M. has also expressed to foster mother her love for mother. *Id.* Healthy bonds are defined by trust, security, care, consistency, stability,

5

involvement, investment and support of the children. Dr. Bernstein testified that there are some elements of a healthy bond present between he children and Mother; however, unhealthy bonds are present as well. *Id.* This Court finds that the children's greatest stability has come in the months since their final removal.

Dr. Bernstein noted the foster mother's firm parenting technique during the interactional observation he conducted between the subject children and the foster mother. *Id.*, at 44. He testified to his concern that the foster mother was a bit authoritarian, but he noted that the children respect her. *Id.*, at 45. M.W., 13, was somewhat withdrawn, and evidently not particularly cooperative with Dr. Bernstein during his interactional. *Id.*, at 46-47. However, M.W. did communicate that he wished to remain in foster mother's care and that he appreciated her assistance with his homework and education. *Id.*, at 49. T.M. communicated that her understanding of adoption is that she would have to call her foster mother "mother." *Id.*, at 47. She reported to Dr. Bernstein that she would feel good but sad if adopted. *Id.*

The foster mother is willing to adopt the children and offer them a permanent home. She addresses T.M.'s special needs. *Id.*, at 183. T.M. receives therapy from the Allegheny General Hospital Center from Traumatic Stress to deal with issues concerning her sexual acting out and bullying .. *Id.*, at 162; 183. Foster mother encourages the children's education and extra-curricular activities. *Id.*, at 184-186. She also helps the children with their emotions and feelings. *Id.*, at 185. She encourages the children to stay in contact with their siblings and prevent disassociating with them. *Id* , at 189. Foster mother testified that she thinks M.W. loves his siblings, but that he is coping with the relief of not having to care for them any longer. *Id.*, at 189. It is clear to this Court that the years of disruptions have taken their toll on the children.

If there was still some sort of question as to whether the children's best interests would be served by terminating Mother's parental rights, it is put to bed when considering that Mother has

6

demonstrated a continued inability to care for the children. Throughout this case, Mother has been propped up by the multitude of services provided by CYF. But even then, she has struggled to provide any sort of prolonged care. Since 2003, Mother has received in-home services through multiple providers. *Id.*, at 124. CYF paid her security deposit and gave her furniture, bunk beds, a crib, and a car seat. *Id.*, at 125. It referred her for domestic violence counseling and drug and alcohol counseling. *Id.* She was given bus passes, housing assistance, couples therapy. *Id.*, at 125. She received clothing allotments, formula and diapers. *Id.* Referrals were made so that Mother could find an apartment, as homelessness had been an issue throughout the case's history. *Id.*, at 126. CYF provided grocery cards, crisis in-home services, and repeated referrals from a multitude of other organizations to help Mother remedy the conditions that led to the children's removal time and time again. *Id.*

But even as Mother has made strides in some areas over the course of time, on the whole she has regressed. Dr. Bernstein testified that Mother has had periods of clarity and focus in her life, but that she has also struggled. *Id.*, at 57. This has become a pattern. While she was able to address one or some issues, others would arise. *Id.* In May 2010, Dr. Bernstein diagnosed Mother with an adjustment disorder with mixed anxiety and depressed mood. *Id.*, at 40. In 2014, Dr. Bernstein diagnosed Mother with a mood disorder, which implies that Mother has regressed in terms of mental health stability. *Id.*, at 52-55. In the context of a best interests analysis, the concern is that Mother cannot appreciate the needs of her children. For example, when T.M. was five years old, she began sexually acting out. *See Id.*, at 34-35. Mother minimized the concerns and suggested that T.M. missed her Mother. *Id.*, at 31. Dr. Bernstein testified that he would be concerned by Mother's downplaying the issue, if, in doing so, she is disregarding or dismissing evidence about her daughter's behavior. *Id.* Downplaying the issue could mean not appreciating important points, like T.M.'s risk

7

for harming others, T.M.'s suffering, or the need for T.M. to receive certain treatment. *Id.*, at 31-32. All of this goes to Mother's knowledge and appreciation for her daughter's needs. *Id.*

Neither CYF nor Dr. Bernstein recommends reunification. CYF hypothesizes that, at best, Mother is a year away from the possibility of returning the children. *Id.*, at 146-147. At the TPR hearing, Mother testified that "this was a real wake-up call for me." *Id.*, at 177. Mother stated that she needed to learn from her mistakes. *Id.* But Mother's issues are significant and her progress has been arrested for years. At a result, Mother has created instability, and her children have suffered the consequences of that. More to the point, however, is the fact that Mother cannot rectify these problems and has demonstrated a repeated incapability to care for the children. As such, there is no question that a termination of her parental rights serves the best interests of the children.

## CONCLUSION

After a careful review of all the evidence set forth above, this Court concluded that CYF had carried the burden of proving by clear and convincing evidence that the children's best interests will be served by terminating Mother's parental rights. For these reasons, the decision of the Court should be affirmed.

BY THE COURT:

_____, J.

8