J-S21031-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: M.E.W., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: D.R.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 407 MDA 2022 |

Appeal from the Decree Entered February 2, 2022
In the Court of Common Pleas of Wyoming County Civil Division at
No(s):  2021-00015


BEFORE:  DUBOW, J., KUNSELMAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:       **FILED: JULY 19, 2022**

D.R.W. (Father) appeals from the February 2, 2022 decree entered in the Court of Common Pleas of Wyoming County (orphans' court) granting the petition filed by Wyoming County Children and Youth Services (CYS) to involuntarily terminate his paternal rights to Child (d.o.b. December 2010) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b). Father claims that CYS failed to provide clear and convincing evidence to support the termination and that the orphans' court opinions fail to provide a rationale capable of review.  We affirm.

_____

[*] Retired Senior Judge assigned to the Superior Court.

**I.**

On August 5, 2021, CYS filed a petition for involuntary termination of the parental rights (TPR) to Child and the court held a TPR hearing on January 31, 2022.[1]  Crystal Miller, CYS Caseworker; Michael Cowley, Esquire, Child's guardian *ad litem* (GAL); Father; and his wife, J.W., testified.[2]  The following testimony was produced.

Father and Child's natural mother (Mother) were not married when Child was born in 2010.  Before the dependency case commenced, Father lost custody of Child and an order suspended him from making any contact with her.  Hence, if he did interact with her, it was in violation of the orphans' court's order.  The dependency action commenced when Child was removed from Mother's care and adjudicated dependent on October 8, 2019.  She was placed in a foster family with her sister where she has remained.  J.W. testified

_____

[1] The court held a TPR hearing on November 9, 2021, that was continued until January 31, 2022, because of the court's schedule.  On December 1, 2021, the court involuntarily terminated the parental rights of natural mother (Mother) and Father to Child.  It vacated the order as to Father on December 2, 2021.  Mother did not appeal the termination of her parental rights and is not a party in this appeal.

[2] Father mentions that Child, eleven-years-old at the time of the TPR hearing, did not testify.  (*See* Father's Brief, at 16).  However, he does not argue that this was error or a ground for overturning the court's order.  In any event, it was within the court's discretion whether Child testified.  *See K.L.C.-S v. D.W.S.*, 245 A.3d 1071, 2020 WL 7353815, unpublished memorandum, at *6 (Pa. Super. filed Dec. 15, 2020) ("It is clear that the trial court has discretion whether or not to have minor children testify at custody hearings.") (brackets omitted) (citing Pa.R.C.P. 1915.11(b), (c)).

that she and Father had a strong relationship with Child and her siblings prior to her 2019 adjudication of dependency. On the occasions that Father would pick Child up from school, she appeared calmer at the home he shared with his wife and stepson than when she was at Mother's home. Father and J.W., his wife of twenty years, testified that Father actively played with Child, tried to teach her right from wrong, oversaw her homework, spent time doing activities with her outdoors and watched her favorite movie with her. (**See** N.T. TPR Hearing, 1/31/22, at 9-10, 32, 44, 48-50, 82-83, 85-86).

Father did not request visitation with Child in 2019. The November 2019 Family Service Plan (FSP) for Father included goals that he obtain appropriate housing, become gainfully employed by December 2020, submit to mental health and drug and alcohol evaluations, and maintain consistent visitation with Child. Letters sent by CYS to Father's last known address were returned undeliverable. Father was not present at the initial permanency review hearing on February 11, 2020. He attended the next permanency review hearing on July 14, 2020, and requested visitation with Child, which the court granted. (**See id.** at 13-16, 32-33, 49).

On July 17, 2020, Father attended a meeting with Ms. Miller at the CYS office and he reviewed, discussed and signed the FSP with CYS Caseworker Crystal Miller. Pursuant to the goals established by the FSP, Father again was to immediately seek a drug and alcohol (D&A) evaluation, secure a mental health evaluation, obtain gainful employment and maintain consistent

visitation with Child. Despite having agreed with these goals, Father advised Ms. Miller that he did not need either a D&A evaluation or mental health treatment. However, when asked to provide a drug screen pursuant to the court's standing order, he refused the test and stated he "would fail for Vicodin and shit." He had no excuse for why he had made no contact with CYS for the preceding approximately eight months after Child had been adjudicated dependent other than that he felt that the court system had not treated him fairly in an unrelated custody matter involving Child's natural mother. (*Id.* at 17); (*see id.* at 14-18).

Father had seven supervised visits with Child after July 2020 until his final visit with her on October 27, 2020. Ms. Miller testified that Father acted appropriately and Child did not object to them. (*See id.* at 27, 34, 36).

On November 1, 2020, Father was arrested and incarcerated for four days for the domestic abuse of J.W., which had occurred in the presence of his minor stepson, who called 911. Father explained the domestic abuse incident was the result of him not wanting J.W. to leave the home that day to acquire illegal drugs. J.W. corroborated this and accused Father of drinking alcohol that day. The court suspended Father's visitation with Child upon his arrest, but Father did not contact CYS to reinstate visitation when he was released on November 5, 2020, despite being present at the December 23, 2020 permanency review hearing. Therefore, he had not seen Child since October 27, 2020, more than fifteen months prior to the TPR hearing. Despite

this and his failure to send Child any cards, letters or gifts for the approximately three birthdays and Christmases that had passed while she was in placement, he and J.W. testified that he had a strong relationship with Child prior to the involvement of CYS in 2019. He conceded that there was a court order in place suspending his contact with Child when he saw her in 2019 prior to the dependency action's commencement. (*See id.* at 21, 27, 48-50, 65-66, 77, 81, 83, 90).

Ms. Miller testified that Father failed to reach out to contact her at any time inquiring about Child's well-being and welfare. Even though Ms. Miller told him that Child was to undergo surgery for polyps related to a possible diagnosis of cystic fibrosis, he failed to make himself available to be with her at the time of the surgery. In fact, he blocked Ms. Miller's cell phone number so that she was unable to contact him further to tell him the surgery's outcome. (*See id.* at 25-26).

Reunification with either parent remained the primary goal for Child pursuant to the FSP until the orphans' court approved a goal change to adoption after a December 23, 2020 permanency review hearing. Father appeared at the hearing and still had not started either a D&A program or obtained a mental health evaluation. Father finally appeared for his first D&A evaluation on January 27, 2021, and admitted he had no excuse for the six-month delay. Had he begun participating in D&A or mental health evaluations immediately as he had been ordered to do, he would have had sixty-one

sessions as of the date of the TPR hearing. Instead, he had attended only five D&A sessions (the evaluation and four treatment sessions) from the time he finally got his evaluation on January 27, 2021, until they stopped altogether on June 9, 2021. Thirteen of his fifteen drug screens were negative. In June 2021, Father failed a drug screen, testing positive for THC, which he attributed to ingesting a gummy bear he had purchased at a local gas station, an explanation Ms. Miller found implausible. At the time of the TPR hearing, he was residing at the Wyoming County Correctional Facility for failing a probation test for alcohol. Father never attempted to schedule the mental health evaluation ordered in the FSP. (*See id.* at 19, 21-24, 34, 41, 43, 47, 73).

Father also failed to obtain employment to financially provide for Child and he has no income. He claimed that he had not been employed since 2019 because he could not afford to go back and forth for the limited amount he was earning. His wife J.W.'s social security disability was the only income available for his household. J.W. maintained that she and Father had the ability to financially care for Child despite his failure to obtain employment and his lack of other income. Although Father justified his inability to find employment or attend mental health treatment as being caused by a lack of available transportation, he also admitted that J.W. had a reliable vehicle available for him to use for those purposes. (*See id.* at 16, 62, 69-71, 87).

Father testified that Child and her half-sister have an "uncanny bond" with one another. He admitted that he does not have a strong bond with Child but believes they "can get [it] back." Father agreed that it was "going on three years since [he] last had any involvement" with Child. He stated that he should have been allowed visitation with Child after his abuse incident with J.W. because "[p]eople get arrested all the time [and] get their visits back." (*Id.* at 49, 65-66, 68, 75).

Ms. Miller maintained that Child is very bonded with her half-sister with whom she has resided in the foster care home since November 15, 2019. Child does not want to be separated from her sister or to live with Father, whom she refers to as mean. Ms. Miller testified that, "the girls are a lifeline to each other" and that "separating them would … be detrimental to both of the girls." Child is very bonded to the pre-adoptive family, considers the other children in the home her siblings, and calls the parents "mom" and "dad." She wants to stay where she is placed because she feels safe there and wants to be with her sister. She does not ask about Father and had no adverse reaction when her visits with him were suspended. Child is happy and doing well in school, which is an improvement from her educational history prior to her placement. Ms. Miller testified that there is no "residual bond" between Child and Father and that it would be in Child's best interests to have Father's parental rights terminated. (*Id.* at 11, 31); (*see id.* at 10, 20-21, 28-31).

Mr. Cowley, Child's GAL, stressed that Child staying in her foster home would provide her with needed stability. Child fears being removed from her foster home where she feels safe and has a "clear bond with [her] proposed adoptive parents." While he acknowledged that Father loves Child, he did not believe he was capable of taking the actions necessary to be a parent. He believed that it would be in Child's best interests to involuntarily terminate Father's parental rights. (**Id.** at 107); (**see id.** at 105-09).

On February 2, 2022, the orphans' court issued an order containing detailed findings of fact and conclusions of law and concluded that there was sufficient evidence to involuntarily terminate Father's parental rights based on 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). (**See** Order, 2/22/22, at 1-5). Father timely appealed and filed a concise statement of errors complained of on appeal.[3] **See** Pa.R.A.P. 1925(a)(2)(i). On April 2, 2022, the orphans' court filed a supplemental opinion in which it concluded that the evidence

_____

[3] We review the orphans' court's order for an abuse of discretion. **See In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted). Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017). "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010). "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

established that there was no bond between Father and Child and that termination of parental rights would best serve Child's best interests. (**See** Opinion, 4/02/22, at 1-4).

## II.

## A.

The orphans' court terminated Father's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provide:

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

- 9 -

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d 465, 473 (Pa. Super. 2000) (citation omitted).  For the following reasons, we conclude that the orphans' court correctly determined that CYS met its burden of proof under subsections 2511(a)(2) and (b).

**B.**

Father's argument regarding subsection 2511(a) does not dispute the testimony offered by CYS, but instead maintains that the evidence was insufficient, and that the orphans' court failed to explain its rationale for its

conclusion that termination of parental rights was in Child's best interests in light of his testimony.[4] (*See id.* at 19, 21-29). We disagree.

We first address the court's termination of Father's parental rights pursuant to Section 2511(a)(2). *See Int. of K.M.W.*, *supra* at 473.

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003).

_____

[4] Father's argument that the orphans' court failed to explain its reasoning appears to be an attempt to have this Court re-weigh the evidence. (*See* Father's Brief, at 19, 21-22, 27-29) (the court "does not explain why it disregards the meaningful and compelling evidence of [] Father and carefully consider the entire record."). While the orphans' court decisions are not lengthy, when read in tandem, they detail the evidence on which the court relied, that Father met the factors for termination and lead to its conclusion that there is no bond between Father and Child and that termination would be in Child's best interests. In fact, the April 2, 2022 opinion expressly refers to Father's testimony and why the testimony of Ms. Miller belied his version of events. (*See* Orphans' Court Opinion, 4/02/22, at 3). The orphans' court decisions provide the testimony on which it relied in reaching its decision, and that the evidence established the factors necessary for termination. (*See* Orphans' Court Order, 2/02/22, at 1-5); (Orphans' Court Opinion, 4/02/22, at 1-4).

Pursuant to Section 2511(a)(2), parents are "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." *In re J.R.E.*, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." *See id.* (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2) due to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re S.C.*, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted). "It is incumbent upon a parent when separated from his child to maintain communication and association with the child. This requires an affirmative demonstration of parental devotion, imposing upon the parent the duty to exert himself, to take and maintain a place of importance in the child's life." *In re T.D.*, 949 A.2d 910, 919 (Pa. Super. 2008), *appeal denied*, 970 A.2d 1148 (Pa. 2009) (citation omitted). "The parent wishing to reestablish his parental responsibilities bears the burden of proof on this question." *Id.* (citation omitted).

Instantly, contrary to his assertion otherwise, the court was aware of Father's testimony that he had a strong relationship with Child prior to the involvement of CYS in 2019. (*See* Trial Ct. Op., 4/02/22, at 3). However, it observed that nearly three years had passed since then and that in the

meantime, he has never contacted CYS to inquire about Child's general welfare, he blocked Ms. Miller's ability to call him, has not sent Child cards, letters or gifts or seen her for over a year since October 27, 2020. (**_See id._**); (**_N.T._** TPR Hearing, at 25-27, 65-66). It found that:

> [Father's] conduct … indicates a settled intent on his part to relinquish his parental claim to [] Child and/or a refusal or failure to perform his parental duties pursuant to 23 Pa.C.S. § 2511(a)(2). … [His] documented lack of compliance with [] Child's Permanency Plan and lack of progress indicates [] Father's refusal to remedy the circumstances which necessitated the original placement.

(Orphan's Ct. Op., 2/22/22, at 3).

> Further:
>
> The evidence of record[] reflects that Father has failed to perform his parental duties for well over twelve (12) months. The evidence further reflects that Father has failed to meet the needs of the Minor Child. There is no evidence that there is any sort of bond or relationship between Father and the Minor Child. Father has not seen Minor Child in well over a year. Father was provided with a family service plan and failed to meet any of the goals. Father has put forth minimal to no effort as it pertains to Minor Child. The best interests of the Minor Child will best be served by terminating Father's parental rights.

(Orphans' Court Opinion, 4/02/22, at 4). The record supports the orphans' court's conclusion.

It is undisputed that Child, eleven-years-old at the time of the TPR hearing, had been in foster placement for approximately twenty-seven months and had not seen Father in over a year. CYS presented clear and convincing evidence that the conditions that led to Child's placement continued to exist.

Despite Father's testimony that he had a good relationship with Child prior to the involvement of CYS in 2019, he conceded that prior to the commencement of the dependency matter, there was a court order in place suspending his contact with Child  (*See* N.T. TPR Hearing, at 66).  After she was placed on October 8, 2019, Father did not contact CYS to request visitation with Child or for any other purpose until the July 14, 2020 permanency review hearing.  (*See* N.T. Hearing, 12-14).  In fact, Ms. Miller testified he has never contacted her to inquire about Child's general welfare, declined to attend Child's surgery and blocked Ms. Miller's cell phone number so that she could not contact him.  (*See id.* at 25-26, 65-66).  Father has never sent cards, letters or gifts to Child for the three birthdays and Christmases that have passed while she was in foster care.  (*See id.* at 27).  When his visitation was suspended temporarily upon his November 1, 2020 arrest, he failed to contact CYS to have the custody reinstated when he was released on bail four days later November 5, 2020, or to request its reinstatement when he appeared at the December 23, 2020 permanency review hearing.  (*Id.* at 21).  Hence, at the time of the TPR hearing, he had not seen Child for fifteen months.  (*See id.* at 27).

Crucially, he failed to comply with his FSP goals.  He failed to get a mental health evaluation or obtain employment, resulting in no income and financial insecurity.  (*See id.* at 16, 24, 43, 62, 69, 71).  The only income available for his household was J.W.'s social security.  (*See id.* at 71).  Despite

claiming he had no transportation to meet these goals, he admitted that J.W. had a vehicle that would be available for him to use since she was not working. (*See id.* at 71).

At his meeting with Ms. Miller on July 17, 2020, he said he did not need a D&A evaluation or a mental health evaluation despite also stating that if he were drug tested at that time, he would be positive for "Vicodin and shit." (*See id.* at 17-18). He had no excuse for why he failed to obtain the D&A evaluation until six months later on January 27, 2021. (*See id.* at 73). He was inconsistent with his D&A counseling, attending only six D&A sessions from the time he finally got his evaluation and when they stopped on June 9, 2021. (*See id.* at 19, 21-24, 41, 43). He failed the June 2021 drug screen, testing positive for THC and claimed that it was due to ingesting a gummy bear from a local gas station, an excuse that Ms. Miller found implausible. (*See id.* at 22).

It was within the orphans' court's province to weigh this testimony against that of Father, to believe all, some or none of it, and to resolve any conflicts in the evidence. *In re A.S.*, *supra* at 477. Based on the foregoing, CYS provided clear and convincing evidence that due to his continued incapacity, Father is unable to provide Child with the essential care necessary for her physical and mental well-being. The orphans' court did not abuse its discretion in finding that CYS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

## C.

Having determined that the court properly found that termination of Father's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Child's best interests pursuant to subsection 2511(b) or whether, as Father argues, the orphans' court decision "places at risk the strong bond and attachment between [him] and [Child]." (Father's Brief, at 26).

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.
>
> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.
>
> It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

***Int. of K.M.W.***, ***supra*** at 475 (case citations and most quotation marks omitted).

Ms. Miller testified that Child is extremely comfortable in her foster home where she has lived with her sister for twenty-seven months, since November 15, 2019. (*See* N.T. TPR Hearing, at 10). Child has a "clear bond" with her pre-adoptive family, considers the other children in the home to be her siblings, and calls her foster parents, who are adoptive resources, mom and dad. (*See id.* at 28). She testified that Child and her sister "are a lifeline to each other" and that separating them would be detrimental to them. (*Id.* at 11). Child wants to stay where she is placed because she feels safe there. (*See id.* at 31). Child does not want to live with Father, whom she refers to as "mean" or to be separated from her sister. (*See id.* at 20, 31). She does not ask about Father and had no reaction when his visits were suspended. (*See id.* at 21, 30). Child is happy and doing very well in school, a major improvement from her educational history prior to her placement. (*See id.* at 29-30). Ms. Miller testified that there is no bond between Child and Father and that it would be in Child's best interests to have Father's parental rights terminated. (*See id.* at 31). Father admitted he does not have a strong bond with Child but that they "can get [it] back." (*Id.* at 75).

The GAL stressed Child's need for stability that the foster home would provide. (*See id.* at 105-09). Child is afraid she will be removed from her foster home where she feels safe and has a "clear bond with [her] proposed adoptive parents." (*Id.* at 107). Although he acknowledged that Father loves Child, he did not believe Father could do what was necessary to be a parent

to Child. (**See id.** at 108-09). He agreed that it would be in Child's best interests to involuntarily terminate Father's parental rights. (**See id.** at 109).

The above record supports the orphans' court's finding that the termination of Father's parental rights would best serve Child's interests pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Father's parental rights to Child.

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 07/19/2022