J-A28021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: C.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1905 EDA 2022 |

Appeal from the Order Entered July 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-DP-0000888-2020

| | | |
|---|---|---|
| IN THE INTEREST OF: C.M.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: K.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1906 EDA 2022 |

Appeal from the Decree Entered July 11, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s):  CP-51-AP-0000291-2022

BEFORE:  PANELLA, P.J., LAZARUS, J., and SULLIVAN, J.

MEMORANDUM BY LAZARUS, J.:                    **FILED DECEMBER 08, 2022**

K.G. (Mother) appeals from the order and decree,[1] entered in the Court

of Common Pleas of Philadelphia County, changing the permanency goal from

reunification to adoption and involuntarily terminating her parental rights to

---

[1] On August 31, 2022, our Court, *sua sponte*, consolidated the appeals at Nos. 1905 and 1906 EDA 2022.  **See** Pa.R.A.P. 513.

her minor son, C.G. (Child) (born 10/2019).[2]  After careful review, we affirm.

In June 2020, the Philadelphia Department of Human Services (DHS) received a General Protective Services (GPS) report that Mother had a history of opioid use and was homeless.  In July 2020, DHS implemented in-home services for Mother's family through the Community Umbrella Agency (CUA). In August 2020, DHS filed a dependency petition for Child.  On September 10, 2020, Child was adjudicated dependent and was taken into DHS' custody. Mother was referred for a dual-diagnosis assessment, three random drug screens, and for parenting, housing, and employment classes.

Permanency hearings were held consistently through March 2022.  At every listing, Mother was re-referred for drug screens, assessments, and monitoring.  Mother's ongoing single case plan objectives throughout the life of the case included:  (1) obtain mental health treatment; (2) undergo substance use treatment and random drug screens; (3) take housing course; (4) attend parenting classes; (5) attend anger management classes; and (6) remain consistent with visitation.

_____

[2] Mother has filed one notice of appeal for each lower court docket (dependency and adoption) in compliance with *Commonwealth v. Walker*, 185 A.3d 969 (Pa. 2018), which held that "in future cases [Pa.R.A.P.] 341(a) will, in accordance with its Official Note, require that when a single order resolves issues arising on more than one lower court docket, separate notices of appeal must be filed.  The failure to do so will result in quashal of the appeal." *Id.* at 977.  *See also In re M.P.*, 204 A.3d 976 (Pa. Super. 2019) (applying *Walker* holding in termination of parental rights/goal change appeal).

Overall, Mother failed to progress beyond minimal to moderate compliance with her service plan objectives and reunification goal. N.T. Goal Change/Termination Hearing, 7/11/22, at 22 (case manager rating Mother's compliance as "substantial" at time of goal change/termination hearing, but "minimal" throughout lifetime of case). Mother failed to consistently engage in court-ordered mental health, drug, and alcohol treatment. Between January and April 2022, Mother tested positive for marijuana and cocaine on her drug screens. While Mother ultimately attended and completed parenting and housing courses, it took her nearly two years to do so. *Id.* at 17-19. Mother consistently attended her two-hour weekly visits with Child;[3] the visits, however, never progressed beyond supervised. *Id.* at 21 (case manager testifying Mother's visits were always supervised because "there are concerns with mom just addressing the mental health and drug and alcohol"). Mother provided proof of employment, but was residing at a shelter at the time of the hearing. *Id.* at 20.

On April 29, 2022, DHS filed a petition to change Child's permanency goal from reunification to adoption and to involuntarily terminate Mother's parental rights to Child. The court held a goal change/termination hearing on

---

[3] The visits were originally held at an office in DHS' building. However, three months before the termination hearing, the visits were moved to "supervised by [the] agency, in the community." N.T. Goal Change/Termination Hearing, 7/11/22, at 20.

July 11, 2022,[4] at which CUA Case Manager Breona Palmer and Turning Points for Children Outcome Specialist Fateema Boldon testified.[5] Following the hearing, the trial court entered a decree involuntarily terminating Mother's parental rights pursuant to sections 2511(a)[6](2), (5), (8)[7] and (b) of the Adoption Act,[8] and ordered the permanency goal be changed to adoption.

Mother filed timely notices of appeal and a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Mother raises the following issues for our consideration:

> (1) Did the trial court err as a matter of law and abuse its discretion by allowing the case manager to testify to the results of Mother's drug screens over the objection of Mother's counsel where the CUA case manager lacked personal knowledge, the testimony lacked foundation, and the testimony was inadmissible hearsay?
>
> (2) Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating Mother's parental

---

[4] At the hearing, Child was represented by James King, Esquire, guardian *ad litem* and child advocate.

[5] Although Mother was present at the hearing, she chose not to testify.

[6] The trial judge specifically declined to grant DHS' petition with respect to termination under 23 Pa.C.S.A. § 2511(a)(1), concluding that Mother did not "evidence[] a settled purpose to relinquish parental claim to [C]hild." N.T. Goal Change/Termination Hearing, 7/11/22, at 47-48.

[7] "With respect to any petition filed pursuant to subsection (a)(8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition." 23 Pa.C.S.A. § 2511(b).

[8] 23 Pa.C.S.A. §§ 2101-2938.

rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(2) in the absence of clear and convincing evidence that Mother's repeated or continued incapacity caused Child to be without parental care and control, and that Mother could not, or would not, remedy the incapacity?

(3) Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(5) in the absence of clear and convincing evidence that the conditions which led to Child's removal continue to exist, that Mother is not likely to remedy the conditions within a reasonable period of time, and that termination of Mother's parental rights would best serve child's needs and welfare?

(4) Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(a)(8) in the absence of clear and convincing evidence that conditions which led to Child's removal continue to exist, and that termination of Mother's parental rights would best serve Child's needs and welfare?

(5) Did the trial court err as a matter of law and abuse its discretion by involuntarily terminating Mother's parental rights pursuant to 23 Pa.C.S.[A.] § 2511(b) in the absence of clear and convincing evidence that termination would best serve the needs and welfare of Child?

(6) Did the trial court err as a matter of law and abuse its discretion by changing Child's permanency goal to adoption in the absence of clear and convincing evidence that adoption would be in Child's best interest?

Mother's Brief, at 4-5.

Mother first asserts that, in making its decision to terminate her parental rights, the trial court relied on improperly admitted testimony from Ms. Palmer regarding the results of Mother's post-April 2022 drug screen. Mother claims that because the drug screen results had been neither identified nor authenticated, nor had any foundation establishing Ms. Palmer's personal

knowledge of the reports been demonstrated, she should not have been permitted to testify about them or even opine on her recollection of the results. Mother's Brief, at 19. ***Id.*** We disagree.

The decision to admit or exclude evidence is within the sound discretion of the trial court. ***In re: A.J.R.-H.***, 188 A.3d 1157, 1166-67 (Pa. 2018). Moreover, an appellate court will only disturb the trial court's decision if the trial court abused its discretion in admitting or excluding the evidence. ***Id.*** at 1167. An abuse of discretion occurs when the trial court overrides or misapplies the law. ***Id.*** (citation omitted).

At the beginning of the hearing, the court entered, without Mother's objection, DHS's Exhibit #2, the Child's dependency court docket. N.T. Goal Change/Termination Hearing, 7/11/22, at 6. The court also explained that it was taking judicial notice of any single case plan objectives and court orders; Mother did not object to the court taking judicial notice. ***Id.*** at 7.

Instantly, the trial court told Ms. Palmer that she "can't look at the document" but could only rely on her memory to tell the court what Mother tested positive for at her random drug screens. N.T. Goal Change/Termination Hearing, 7/11/22, at 14-15. The court further explained that since the drug screens were court-ordered, Mother was permitted "to testify as to whether or not what [the court] ordered was complied with, and what the results were, based on [Ms. Palmer's] investigation." ***Id.*** at 14. Ms. Palmer testified that it "was [her] understanding that [Mother] was still testing positive" at the time of the last court date in April of 2022. ***Id.*** at 17. Moreover, the court relied

upon Child's dependency court docket, which included the court's April 29, 2022 permanency hearing review order findings. **See** Trial Court Opinion, 8/24/22, at 2; Permanency Review Order, Court's Exhibit B, 4/19/22, at 1-2 ("Mother completed one random on 03/29/22; positive for cocaine and marijuana."). **See also** Permanency Review Order, 7/11/22, at 2 (court further ordering "DHS [Exhibits] #1, #2 & #3 are presented to the court and entered into evidence.").

Mother's failure to object to the court's admission of DHS Exhibit #2 or the court's permanency order demonstrating Mother's positive pre-April 2022 drug screens is fatal to her claim on appeal. While Mother originally objected to the drug screen reports on hearsay and authentication bases, Mother later objected to Ms. Palmer's testimony based on the leading nature of the questions posed by counsel. N.T. Goal Change/Termination Hearing, 7/1/22, at 13-16. The court sustained counsel's latter objection, but permitted Ms. Palmer to testify regarding all pre-April 2022 screens as competent record evidence based upon the court's own permanency review order. We conclude that the trial court did not abuse its discretion in admitting this evidence, **In re: A.J.R.-H.**, **supra**, where Mother specifically agreed to permit the court to take judicial notice of its orders as well as the entire dependency docket. **See In re S.C.B.**, 990 A.2d 762 (Pa. Super. 2010) (in order to preserve issue for appellate review, party must make timely and specific objection at appropriate stage of proceeding before trial court).

Mother next claims that the trial court erred in concluding that DHS satisfied its burden of proving that termination was proper under section 2511(a). We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law. *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003). Our scope of review is limited to determining whether the trial court's order is supported by competent evidence. *Id.*

The trial court found the testimony of both Ms. Palmer and Ms. Boldon credible.[9] N.T. Goal Change/Termination Hearing, 7/11/22, at 47. As to section 2511(a), the court credited Ms. Palmer's testimony regarding Mother's ongoing goals to address her drug, alcohol, and mental health issues, that Mother was still testing positive for cocaine and marijuana[10] just three months prior to the hearing, and that, as a result, Mother does not have the capacity to provide Child with the requisite parental care, support, and subsistence necessary to meet his emotional and mental needs. *Id.* at 49. Moreover, while Mother had allegedly completed a housing assistance program through DHS at the time of the termination hearing, she was still living in a shelter and had taken almost two years to make progress on her housing goal. We agree with the trial court that termination was proper under subsection 2511(a)(2). *See id.* (repeated and continued incapacity, abuse, neglect, or

---

[9] The trial judge noted that it used only Ms. Palmer's testimony for the purpose of determining whether termination was proper under section 2511(a). N.T. Goal Change/Termination Hearing, 7/11/22, at 48.

[10] DHS Exhibit #1, a July 20, 2021, drug test report reveals that Mother tested positive for marijuana and PCP.

refusal of parent has caused the child to be without essential parental care, control, or subsistence necessary for his physical or mental well-being and conditions and causes of incapacity, abuse, neglect, or refusal cannot or will not be remedied by parent).[11]

Our analysis of whether termination was proper under section 2511(b) is a much more difficult task where the record is clear that Mother and Child had a strong bond. N.T. Goal Change/Termination Hearing, at 37 (Ms. Boldon testifying Child "has always been attached to [Mother" and Child is "happy" when Mother arrives for visits); *id.* at 38 (Ms. Bolden testifying Child "runs" to Mother when visits begin and when the visits are over "it's kind of hard to get him away [from Mother]"); *id.* (Ms. Boldon testifying Child said, "Where's my mom," and "[I] don't want to leave my mom").

"[I]n terminating the rights of a parent[, the court] shall give primary consideration to the needs and welfare of the child." 23 Pa.C.S.A. § 2511(b). Under subsection 2511(b), the judicial inquiry is to be centered on the interests of the child, not the fault of the parent. *See In re Adoption of J.J.*, 515 A.2d 883, 892 (Pa. 1986).

The record reveals that Child, who was in kinship care with maternal aunt at the time of the goal change/termination hearing, is actively engaged in early intervention services, N.T. Goal Change/Termination Hearing,

---

[11] We may affirm the trial court's decision regarding the termination of parental rights with regard to any single subsection of section 2511(a). *In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (en banc).

7/11/22, at 24, is doing well in his kinship home, *id.* at 23, looks to maternal aunt for comfort and basic needs, and is thriving in her care. *Id.* at 25. Ms. Palmer testified that maternal aunt is a pre-adoptive resource who provides Child with safety and stability and has a "close relationship" with Child. *Id.* at 25-26. Ms. Palmer also testified that although Child does have a relationship with Mother, *id.* at 28, because Child has been in placement for almost his whole life, termination would be in Child's best interest and not cause Child irreparable harm. *Id.* at 27-29 (case manager testifying Child needs permanency and termination would not "hurt" Child). Finally, and most critically, Ms. Palmer testified that she did not believe Mother would be able to parent Child as of the date of the termination hearing. *Id.* at 28.

Outcome Specialist Boldon testified that since November 2020 she has supervised the visits between Mother and Child. *Id.* at 33-34. Ms. Boldon testified that: Mother had missed very few visits with Child, recently the visits have been held at local parks throughout the city, and, during the visits, Mother engages with Child very well by playing with him and taking walks with him. *Id.* at 34-35. Ms. Boldon also testified that Child is happy to see Mother at visits, that he "runs to her" when he sees her, that he calls Mother "Mom," and that he is bonded to Mother. *Id.* at 37-38, 40. Finally, Ms. Boldon testified that Child has the same bond with maternal aunt that he has with Mother, and, that when visits are over, "he goes to the aunt just fine." *Id.* at 40.

With respect to terminating Mother's parental rights under section 2511(b), the trial court carefully and deliberately set forth its reasons for concluding DHS met its burden of proof:

> That then takes this [c]ourt to 2511(b), and whether or not there's a bond that exists between C[hild] and [Mother]. The testimony of Ms. Fateema Boldon is clear that there is a bond between [Mother] and C[hild].
>
> So, that then means that this [c]ourt has to grapple with the fact of whether that bond is of a nature such that terminating, involuntarily, [Mother's] parental rights to C[hild] would provide[—]would give any detrimental[—]would cause any detrimental harm to C[hild].
>
> Based on the testimony that I heard – and this [c]ourt cannot consider things that could potentially happen in the future; just as they are today. The relationship that C[hild] has with his maternal aunt is such that this Court does not believe that there would be any detrimental impact to him, given the response that he has to his maternal aunt, his current kinship caregiver.
>
> I'm not sure if the testimony would've been different if he had been in a different home, but the testimony is that he has developed such a strong bond, and to quote the outcome specialist, ["]a very strong bond["] with his maternal aunt.
>
> That does not take anything away from the testimony of[—]I'm sorry[—]the testimony that he has a very strong bond with his maternal aunt, to be clear, was from the supervisor, Ms. Palmer.
>
> The testimony from the outcome specialist, Ms. Boldon, is that he is also bonded to his maternal aunt. And, in fact, her testimony is that he has the same reaction to his maternal aunt when he sees her as he does to his mother when he sees her, and that, since he's been in his maternal aunt's home, it is not as difficult to disengage him from the visits with [Mother].
>
> So, based on that, this [c]ourt is going to find that there would not be any detrimental impact such that I shouldn't terminate the parental rights of [Mother] as to C[hild] under 2511(b).

*Id.* at 50-52.

As the trial court clearly notes, Child has an undeniable bond with Mother. However, the fact that a child has a bond with a parent does not preclude the termination of that parent's parental rights. *In re A.D.*, 93 A.3d 888, 897 (Pa. Super. 2014). Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination "would destroy an existing, necessary, and beneficial relationship." *Id.* at 898 (citation omitted). Moreover, in making a determination under section 2511(b), the trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the adoptive resource. *In re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011); *see also In re K.K.R.S.*, 958 A.2d 529, 533-36 (Pa. Super. 2008) (while parent's emotional bond with child is major aspect of subsection 2511(b) best-interest analysis, it is only one of many factors to be considered by court when determining best interest of child). Ultimately, the concern is the needs and welfare of the child. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010).

In *In re T.D.*, 949 A.2d 910 (Pa. Super. 2008), our Court was faced with a similar situation "wherein obvious emotional ties exist[ed] between [a child] and [his p]arents." *Id.* at 920. Despite those ties, our Court recognized that "in light of [p]arents' demonstrated inability to provide the minimum level of parental care, preserving [parent's] right[s] would foreclose any hope of adoption and condemn [child] to foster care until he reaches majority." *Id.* at 923. Thus, the court concluded that termination best served child's needs and welfare under subsection 2511(b). *Id.*

Unlike the instant case, where Child has an equally strong bond with his maternal aunt who is also his kinship caregiver and potential adoptive parent, the child in **T.D.** had no such identifiable pre-adoptive placement. **Id.** at 923. **Cf. In re E.M.**, 908 A.2d 297 (Pa. Super. 2006) (despite children's preference to reunify with mother, termination did not serve needs and welfare of children where there was no identifiable relative with whom they could be placed, children were older siblings who shared strong emotional bond in foster care and should not be separated before aging out of system). Therefore, this case arguably presents a stronger factual basis to terminate parental rights under subsection 2511(b), where not only is Mother unable to capably parent Child and fulfill his emotional, physical and developmental needs, but where maternal aunt has a significant bond with Child and is a pre-adoptive resource. **Cf. In re E.M.**, 620 A.2d 481, 482 (Pa. 1993) (termination order reversed where court failed to consider whether parent-child bond existed and extend that severing any such bond would be contrary to needs and welfare of child); **In re P.A.B.**, 570 A.2d 522 (Pa. Super. 1990) (where court did not consider children's relationship with parents and children currently benefit from relationship with parents, termination would injure children; maintaining *status quo* best served children's needs and welfare).

Accordingly, we conclude that there was clear and convincing evidence that termination best serves Child's needs and welfare under section 2511(b), where Child needs permanency and termination will not harm Child who has

a strong bond with his kinship caregiver, maternal aunt.[12] Here, the same issues that led to Child being declared dependent—Mother's drug/mental health/alcohol issues and homelessness—still exist. Credible testimony supports the court's conclusion that Mother is incapable of adequately parenting Child where Mother continued to test positive for drugs, had not secured suitable housing, and where she waited more than one and a half years to put forth a significant effort to comply with her plan objectives following Child's placement. The trial court carefully considered each aspect of the matter and determined that despite child's definite bond with Mother, said bond could not take the place of permanent, stable and appropriate placement which provides child with the ability to thrive. We commend the trial court for their exacting analysis.

Order[13] and decree affirmed.

---

[12] Maternal aunt also has sons, who are Child's cousins. **See** N.T. Goal Change/Termination Hearing, 7/11/22, at 40 ("[Child] has the same bond [as with Mother] . . . when the aunt appears with her sons at the end of visits. . . . [H]e goes to the aunt just fine.").

[13] Given our decision to affirm the trial court's termination decree, any challenge to the goal change order is moot. **See Interest of D.R.-W.**, 227 A.3d 905, 917 (Pa. Super. 2020).

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

*Date: 12/8/2022*